UNITED STATES of America

v.

Emanuel LESTER, Appellant.

No. 12670.

United States Court of Appeals Third Circuit.

Argued June 21, 1960.

Decided Aug. 16, 1960.

752

Osmond K. Fraenkel, New York City, for appellant.

Daniel J. Snyder, Asst. U. S. Atty., Pittsburgh, Pa. (Hubert I. Teitelbaum, U. S. Atty., Western Dist. of Pennsylvania, Pittsburgh, Pa., on the brief), for appellee.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Appellant was convicted of conspiring to transport in interstate commerce, geophysical maps knowing them to have been stolen, in violation of 18 U.S.C. § 371.[1] He was sentenced to a term of three years and to pay costs of prosecution. One of Lester's co-conspirators previously appealed his conviction which we affirmed in United States v. Seagraves, 3 Cir., 1959, 265 F.2d 876. The facts are there fully set forth. Although the record is more complete on this appeal than on Seagraves', it contains nothing to alter our opinion that "Appellant was sufficiently charged by the indictment with participation in a continuing conspiracy to transport stolen maps interstate. We find no variance between the facts alleged in the indictment and those in evidence upon which the conviction rests." 265 F.2d at page 879. However, several points raised by the well presented argument on behalf of appellant require further discussion.

Smith, an unindicted co-conspirator stole the maps from Gulf Oil Company's Pittsburgh office and turned them over to one Milner who was indicted along with Seagraves and Lester, but has not as yet been apprehended. Smith took the maps from a motive of vengeance rather than profit. Although he knew, generally, to what use Milner was putting the maps, he testified that he did not care. Subsequent to the agreement between Smith and Milner, but during the period of Smith's thefts, Lester and Seagraves met with Milner in Houston, Texas and agreed to purchase the maps from Milner for $2,500 each plus a ⅟₁₆ over-ride on any successful wells brought in as a result of the information contained in the maps. From then on there was an effort to exploit the maps which necessitated taking them to the various states wherein the subject lands of each map were located.

■ Appellant contends that the conspiracy charged to Lester did not commence, nor did any overt act occur, in Pittsburgh so that the venue was improperly laid in the District Court for the Western District of Pennsylvania. In support of this he claims that Smith was not a conspirator because he was unconcerned with the destination of the maps after he turned them over to Milner, and, in the alternative that if there was any conspiracy there were three, separate and distinct; one between Milner and Smith and Pittsburgh; one between Milner, Lester and Seagraves localized in Houston and not having interstate commerce as an element and one between Lester and Seagraves which may have involved commerce but was not the subject of the indictment and had no connection with Pittsburgh.

The first point can be summarily dismissed. It is entirely immaterial that Smith had no interest in what disposition

[1] The pertinent part of this statute reads: "If two or more persons conspire * * * to commit any offense against the United States * * * and one or more of such

Milner made of the maps. He knew they were being taken out of the state. Milner would first call Smith and give him the areas for which he wanted maps. When making photostats of the originals, Smith would delete the Gulf Oil legend and on one occasion he saw Milner use a penknife to cut out the legend. There was sufficient evidence that Smith had knowledge of the purpose of the conspiracy. It is not necessary that he know the scope or all the details of the operation. Poliafico v. United States, 6 Cir., 1956, 237 F.2d 97, 104, certiorari denied 1957, 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597, rehearing denied 353 U.S. 931, 77 S.Ct. 718, 1 L.Ed.2d 725: " * * * the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." Blumenthal v. United States, 1947, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154, rehearing denied 1948, 332 U.S. 856, 68 S.Ct. 385, 92 L.Ed. 425.

■ The claim of the multiple conspiracies is based on the fact that Lester and Seagraves joined the conspiracy subsequent to the agreement between Smith and Milner and that they did not procure Milner to obtain the maps from any place outside Texas. The entire question of jurisdiction raised by appellant is best answered by the following quote from Lefco v. United States, 3 Cir., 1934, 74 F.2d 66, 68:

> "There is nothing new in this defense of multiple conspiracies and nothing uncertain in the law arising from such a defense. Of course, to sustain a verdict on an indictment charging one particular conspiracy the evidence must establish the conspiracy charged. Evidence that establishes another conspiracy or several other conspiracies will not

sustain the verdict. From this statement of law defendants, when in extremity, commonly resort to the contention that, not knowing all the conspirators or not knowing all the others were doing, they are responsible only for what they themselves were doing when caught, and as that usually is only a part of the conspiracy, they say, the part being less than the whole, it is different from the whole and in consequence is not the conspiracy alleged in the indictment and, for lack of proofs, they should be acquitted.

> "Common design is the essence of conspiracy. The crime may be committed whether or not the parties comprehend its entire scope, whether they act separately or together, by the same or different means, known or unknown to some of them, but ever leading to the same unlawful result. * * * All conspirators need not be acquainted with one another, nor need they have originally conceived or participated in the conception of the conspiracy. Those who come on later and cooperate in the common effort to obtain the unlawful results become parties thereto and assume responsibility for all done before. * * * Nor does the mere fact that conspirators individually or in groups perform different tasks to a common end split up a conspiracy into several different conspiracies."

■ There was evidence of maps being stolen and turned over to Milner after Lester joined the conspiracy. This was clearly proof of overt acts committed in Pittsburgh. And Lester's responsibility for those acts occurring prior to his joining the conspiracy lays to rest the question of venue.

■ Appellant further suggests there was no conspiracy within the purview of the federal statute since he did not know

persons do any act to effect the object of the conspiracy, each shall be fined * * * or imprisoned * * * or both." The offense against the United States

was the transporting of stolen goods in interstate commerce in violation of 18 U.S.C. § 2314.

the maps were stolen and even if he did have such knowledge, he entered into no agreement to transport them across state lines. The question of intent, or agreement, to transport the maps across state lines was adequately dealt with in our Seagraves opinion, supra, 265 F.2d at page 879. To be of any use to Lester the maps had to be taken from the place from which they were stolen and placed in his hands. To be exploited they had to be taken to the areas which they depicted. An agreement to transport the maps in commerce, whether it be express or implied, was an inherent part of the scheme.

■ Lester's knowledge that the maps were stolen was proved by sufficient evidence. One Leivia, a government witness, was a member of the group formed to develop possible oil fields shown on the maps until he became suspicious and withdrew. He testified that on several occasions Lester related three different stories to him in response to his queries regarding the source of the maps. Finally when Leivia placed his suspicions squarely before Lester, he (Leivia) was told "to shut up and mind my own business and let him worry about that end of the matter." Another witness, R. G. Perry, exploration manager for a Canadian oil company testified to a conversation he had with Lester when a number of the stolen maps were exhibited to him, as follows:

"* * * A. I asked them straight off the reel, that maps, so many maps must be missed from the files of any company, and that sooner or later this would happen.

"Q. You asked Mr. Lester that? A. Yes. I put it to them.

"Q. Yes. A. I said now these maps must have been stolen.

"Q. You told that to Mr. Lester? A. That's right.

"Q. What did he say? A. He said, 'Well, how else do you think I could get them?'"

■ Appellant contends the admission of this testimony, over defense objection, was reversible error in that it related to maps not set forth in the indictment or bill of particulars, and that it was introduced solely to prejudice the defendant. But this testimony, and the maps upon which it was based, was introduced to show the defendant's guilty knowledge and establish the scope of the conspiracy. Its admission or rejection was within the sound discretion of the trial judge in determining whether any prejudicial effect was counterbalanced by its relevancy and materiality. We do not find that this discretion was abused.

■ Appellant next argues that geophysical maps have no market value so that the $5,000 minimum value, set forth as an element of the crime of transporting stolen goods,[2] has not been established by the government. Several expert witnesses testified that the aggregate value of the maps was well over $5,000. However, cross-examination revealed that they actually did not know of the existence of a market value in the sense of open buying and selling of geophysical maps. Appellant seeks to have us apply the strict definition of "market value" to the word "value" in the statute. After an examination of the legislative background of the statute, the Court of Appeals for the Second Circuit concluded:

"The only reason for the $5,000 limitation is to avoid overtaxing the Department of Justice. There is no legitimate interest of appellants which the Congress sought to protect by this requirement. Hence it is perfectly rational to consider past acts in determining whether any appellant's *conduct is important enough to warrant prosecution by*

---

2. The pertinent part of the statute reads: "Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the val- ue of $5,000 or more, knowing the same to have been stolen * * *." 18 U.S.C. § 2314.

*the Department of Justice."* United States v. Schaffer, 2 Cir., 1959, 266 F.2d 435, 440, affirmed, 1960, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921. (Emphasis supplied.)

And in Husten v. United States, 8 Cir., 1938, 95 F.2d 168, 171 the court stated:

"It is uniformly held that the value of the stolen property is the market value at the time and place of taking *if it has a market value."* (Emphasis supplied.)

Of course in most instances market value is used because under ordinary circumstances it is easily ascertainable. But where an exceptional type of goods that has no market value is the subject matter of the indictment, any reasonable method may be employed to ascribe an equivalent monetary value to the items.

It would do violence to the purpose of the statute were the Justice Department able to take action against the transportation of one carload of, let us say, household goods worth $5,000 but have their hands tied by semantics when the transporting is of geophysical maps worth a sizable fortune.[3]

 Appellant finds support for his position in Abbott v. United States, 5 Cir., 1956, 239 F.2d 310, 313. However, we point to the language used there:

"The very requirement of a $5,000 value points towards a Congressional purpose carefully to limit the Federal sanction in theft of non-ambulatory things to those having a *substantial worth."* (Emphasis supplied.)

The government adequately proved the substantial worth of the maps in question.

 Appellant's argument that in many instances, not the original map but a photostatic copy made by Smith was transported so that it was not actually the stolen property is best answered by appellant's own statement in his brief, relating to market value:

"But no one would suppose that, because a business man would be willing to pay a large sum of money to his competitor's employee to give him a piece of paper on which such a secret was written, the piece of paper had a market value. It is the idea, not its material paper embodiment, which is valuable."

 The admission into evidence of Milner's statement that he obtained the maps from Gulf Oil and transported them to other states, made to Leivia after, as appellant contends, Leivia withdrew from the conspiracy was not error. The withdrawal of a conspirator does not terminate the conspiracy. United States v. Cohen, 3 Cir., 1952, 197 F.2d 26, 29. Furthermore, if any error existed it was cured by the court's clear instruction to the jury, at the request of defendants' counsel, limiting the use of such testimony.[4]

We have reviewed the other arguments of appellant, particularly those relating to the search warrant, and find no merit in them. The question of the search warrant was properly decided by the district court in its opinion at D.C.W.D. Pa.1957, 21 F.R.D. 376.

The judgment of the district court will be affirmed.

---

3. An idea of the value involved in this conspiracy can be gotten from the fact that Smith turned over upwards of 2,000 maps to Milner. For those maps desired by Lester and Seagraves, they agreed to pay $2,500 each plus the $\frac{1}{16}$th override.

4. No inherently inadmissible testimony was involved here as in United States v. Jacangelo, 3 Cir., 1960, 281 F.2d 574.