**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Albert C. DREBIN, Budget Films, Inc., Lawrence S. Fine and Bruce M. Venezia, Defendants-Appellants.**

**No. 75-3475.**

United States Court of Appeals, Ninth Circuit.

July 21, 1977.

Gerald M. Singer and Gerald F. Uelman, argued, Los Angeles, Cal., for defendants-appellants.

Vincent J. Marella, argued, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before CHAMBERS and KENNEDY, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

Albert Drebin, Lawrence Fine, and Budget Films, Inc. have appealed their convictions, following a jury trial, on six counts (Counts Five through Ten) of willful and for-profit infringement, by vending, of copyrighted motion pictures, in violation of 17 U.S.C. § 104;[1] three counts (Counts Two

---

* Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. The indictment charged appellants with infringement of the following pictures: Count Five—"Paper Moon"; Count Six—"The Way We Were"; Count Seven—"Hot Rock"; Count Eight—"Forty Carats"; Count Nine—"The Take"; Count Ten—"The New Centurions".

through Four) of interstate and foreign transportation of stolen and converted property—the copyrighted motion pictures—in violation of 18 U.S.C. § 2314; and one count (Count One) of conspiracy to commit these offenses, in violation of 18 U.S.C. § 371.[2] Bruce Venezia has appealed his conviction of conspiracy (Count One.)[3]

Drebin was fined $20,000 and sentenced to concurrent one year prison terms on each of the counts, with all but three months suspended and probation for three years on condition that the fine be paid. Fine was fined $10,000 and sentenced to concurrent nine-months prison terms under the same conditions. Venezia received a suspended six months sentence and was placed on probation for two years and fined $1,000. Budget Films was fined a total of $18,000.

### Factual Background

Budget Films is a corporation licensed to distribute, rent, and lease films produced by many major studios and maintains an inventory of over 30,000 reels of film. In addition to film rentals, Budget sells film prints. Drebin has been president of Budget Films since its incorporation in 1969 and prior thereto was the sole owner of the business. He was been involved in the motion picture business for approximately 30 years. Fine was vice-president and later secretary-treasurer of Budget Films.

The transactions set forth in the indictment involved eight sales of numerous films to three unindicted co-conspirators, Harry Katz, Johnny Holmes, and Peter Theologo, who operated film libraries or rental agencies in South Africa.

At trial it was stipulated that all of the motion pictures named in the indictment were validly copyrighted. Representatives of the motion picture studios and other copyright proprietors testified with respect to the policies and procedures of the studios in the distribution of their films. The major areas of distribution include theatrical (movie theatres), non-theatrical (private groups), television, airlines and steamships, Armed Services, "V.I.P." (prominent members of the motion picture industry or community), and "studio accommodation" (inter-studio exchanges of films for technical and casting purposes).

All of the studio representatives testified that films are not sold but are licensed for use in the various areas of distribution, and that no prints of the films listed in the indictment had been sold. They testified further that none of the defendants were authorized to possess or sell any of these films. The license agreements were admitted in evidence.

The three unindicted co-conspirators, who had been granted immunity, testified regarding the purchase of films from appellants, including the films specified in the indictment, and their shipment to South Africa.

The defense called numerous witnesses in an effort to prove that films are generally available for sale. The defense sought also, on cross-examination of government witnesses, to establish that the license and lease agreements, made by the studios of their motion pictures, were actually sales.

Testimony was received regarding the destruction of worn-out films by salvage companies. There was some conflict and ambiguity in the evidence with respect to the alleged sale of film by salvage companies.[4]

### Appellants' Contentions

Appellants contend that: (1) the search of Budget Films was in violation of appel-

---

**2.** The overt acts specified in the conspiracy count alleged the unauthorized sale, in addition to the motion pictures listed in counts five through ten, of 20 additional motion picture and television films.

**3.** The court granted Venezia's motion for acquittal on counts two through ten.

**4.** The evidence presented by the respective parties will be discussed in more detail *infra,* in considering the sufficiency of the evidence to sustain the convictions.

lants' Fourth Amendment rights and the evidence seized should have been suppressed; (2) appellants were denied due process by (a) the Government's use of superseding indictments, (b) its failure to comply with an order for a bill of particulars, and (c) its "unbridled expansion of the scope of the charges"; (3) the evidence was insufficient to sustain the convictions; (4) the instructions did not accurately state the law; (5) prosecutorial misconduct deprived appellants of a fair trial; (6) the sentences imposed on Venezia were ambiguous; and (7) the prosecution was barred by the statute of limitations.

## I. Search of Budget Films

On January 7, 1975, on the basis of an affidavit by an F.B.I. agent, a warrant was issued to search the Budget Films premises and seize:

". . . illegally reproduced and stolen copies of 35mm, 16mm, and 8mm motion picture films which are duly copyrighted and protected by the provisions of the United States Copyright law embodied in Title 17, United States Code; books, records, papers and other documents relating to the manufacture and sale of such motion pictures and equipment used in the sale and distribution of such motion pictures which are the fruits and instrumentalities of violations of Title 17[18], United States Code, 371 and 2314."

On January 8, 1975, nineteen F.B.I. agents began the search, which continued throughout the day and the following night for a total of eighteen hours. Incident to the search, the agents seized 551 film prints and thousands of documents which were placed in several file cabinets and six or seven cardboard boxes.

Appellants' motion to suppress the evidence seized pursuant to the warrant was heard and denied on April 7, 1975. Appellants claim the court erred in that (1) the affidavit in support of the warrant contained materially false and inaccurate information, (2) the affidavit did not state probable cause, and (3) the warrant did not specify the property to be seized with sufficient particularity to preclude a general search. We agree with appellants that the evidence should have been suppressed because the warrant authorized an unlawful general search.

The Fourth Amendment provides that no warrant shall issue except upon probable cause and "particularly describing the place to be searched, and the persons or things to be seized". "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927). "Technical precision of description is not required. It is only necessary that there be reasonable particularity and certainty as to the identity of the property to be searched for and seized, so that the warrant shall not be a mere roving commission." *United States v. Quantity of Extracts, Bottles, etc.*, 54 F.2d 643, 644 (S.D.Fla.1931).

We conclude that the search here was an unreasonable and unlawful general search of Budget's premises. The warrant is similar to warrants found to be too general in *United States v. Marti*, 421 F.2d 1263 (2 Cir. 1970). The warrants in *Marti* were directed to "any peace officer in the City of New York", and authorized a search for "certain property [which] is being used and/or possessed in violation of Section 235.05 subd. 1 (Obscenity) of the New York State Penal Law". The Court found the warrants "deficient for failing to describe with particularity the items to be seized as required by the Fourth Amendment". The court continued: "The warrants themselves gave no guidelines to the officers as to what is obscene and what is not. Thus, the warrants on their face left to the executing officials the discretion of deciding what materials were obscene". 421 F.2d at 1268. Similar to *Marti*, this warrant left to the

executing officers the task of determining what items fell within the broad categories stated in the warrant. The warrant provided no guidelines for the determination of which films had been illegally reproduced.

■ We conclude, however, that the error in admitting this evidence was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Chapman* held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt". 386 U.S. at 24, 87 S.Ct. at 828. The Court in *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969), explained the function of an appellate court under *Chapman*: "Our judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the [erroneously admitted evidence] on the minds of an average jury". Citing the preceding quotation from *Harrington*, the Court in *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972) concluded: "Thus, unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required. See *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). In this case, we conclude that the 'minds of an average jury' would not have found the State's case significantly less persuasive had the [improper] testimony . . . been excluded." In light of these princi-

ples, we examine the impact of the illegally seized evidence.

The evidence introduced against Drebin consisted of ten exhibits [5] and was offered to show Drebin's familiarity with copyright law. Drebin later stipulated that "as early as 1961 [he] was completely familiar with the copyright laws of the United States, including the criminal provisions". In view of this stipulation, any error in admitting evidence to show Drebin's knowledge of the copyright law was harmless.

The F.B.I. agent supervising the search testified that no records of sales of film by Budget were found, implying that Budget was attempting to hide the sales. However, the defense extensively cross-examined the agent on this issue and introduced testimony of Budget's bookkeeper that records of film sales were kept in the ordinary course of business. As proof that Drebin knew of a "theft problem" in the film industry, testimony was received indicating that every can of film found at Budget had a notice affixed which read in part: "The theft of 16-mm feature films has reached an all-time high. Please exercise all precautions with our films while in your possession."

This evidence went to the question of willfulness. Appellants have not challenged the sufficiency of the evidence on willfulness; [6] nor have they shown that they were prejudiced by the improperly admitted exhibits and testimony. We are convinced that the "independent, untainted evidence" on the issue of willfulness "was

---

**5.** We have examined all of these exhibits and find that they consisted of a Budget Films catalogue and supplement offering films for sale (which were readily available elsewhere), three letters from a company called Ivy Films concerning Budget's unauthorized leasing of films licensed for distribution to Ivy, and five documents found in a file titled "Copyright Search", consisting of communications with the Copyright Office, Library of Congress, and publications dealing with recent changes in copyright laws and with investigating and renewing copyrights. Appellant's counsel objected to most of these exhibits on the ground of relevancy, stating that Drebin "was familiar with the fact that licenses do apply to films that

copyrights are involved in making pictures" and that material on "copyright and copyright search, and material of that nature" was not an issue. Government counsel contended that the material was relevant on the question of willfulness.

**6.** In questioning the sufficiency of the evidence to sustain the convictions, appellants contend that the Government failed to prove that the films had been "stolen, converted, or taken by fraud" and that the possession of the prints had not been lawfully obtained. They do not argue failure to prove willfulness.

overwhelming". See *United States v. Hunt*, 548 F.2d 268, 269 (9 Cir. 1977).

Drebin had been involved in the motion picture business for about thirty years, and was familiar with the practice of the industry and with copyright law. Budget Films, Drebin and Fine had been licensed by several motion picture studios for nontheatrical distribution of their films and were familiar with the practice of licensing.[7] Fine testified on deposition [8] that he knew it was an industry-wide practice to rent, rather than sell, motion pictures. Ian Waldbaum, purchaser of films from appellants, testified that in 1973 he had a telephone conversation with Drebin during which Drebin stated that he had sold $50,000 worth of films to an individual in South Africa who had not paid for them. When asked why he did not report this to the authorities, Drebin replied that "[I] didn't get them legally."

John Holmes, one of the unindicted co-conspirators who purchased films from appellants, testified that Fine had told him that "it was a Federal offense to copy a film in the United States and one must be careful". Holmes testified that he concluded that the film prints being sold by appellants were illegal because of their extremely low price. He stated that while National Telefilm Associates charged $2,000.00 for the rights on a 16-mm one-hour television program, appellants and other film dealers sold the same program for $150.00.

Harry Katz, another unindicted co-conspirator, testified that he also concluded that appellants' prints were not legal because the sale price of the prints was "much less" than what the studios were charging for rental, and because the studios did not sell prints. Additionally, he testified that

in November, 1974, Fine warned him that the F.B.I. was investigating unauthorized films sales and that Katz "should really be careful about it".

Also admitted in evidence were eleven cancelled checks payable to Venezia (and check stubs) seized from Budget, which indicated that Venezia was being paid by Budget for the resale of the film. The error in admission of this evidence was also harmless in light of other untainted evidence, discussed *infra*, which was sufficient to establish Venezia as a member of the charged conspiracy.

Based "on our own reading of the record and on what seems to us to have been the probable impact" of illegally seized evidence on the "minds of an average jury", we find no "reasonable possibility that the improperly admitted evidence contributed to the conviction[s]". On the facts of this case, we conclude that the Government's case would not have been "significantly less persuasive" had the illegal evidence been excluded.

## II. Denial of Due Process

### A. Superseding Indictments

██ On February 18, 1975, a four-count indictment was returned charging Drebin and Budget Films with copyright infringement. On April 3, 1975, a superseding ten count indictment was returned, based on "newly received evidence",[9] and adding Fine and Venezia as defendants. The indictment was again superseded on May 29, 1975, to cure a pleading defect in counts two, three and four by adding the sentence, "knowing the same to have been stolen,

---

7. Counsel for appellants stipulated that Budget Films had "licenses from Warner Brothers and Columbia Pictures". The F.B.I. agent testified that Budget Films had licensing agreements with Warner Brothers for 104 films and with Columbia Pictures for 109 films. These licensing agreements were not offered in evidence; nor were any of the films which were seized.

8. None of the appellants testified at trial.

9. This indictment charged the one count of conspiracy, six counts of willful infringement, naming motion pictures different than those named in the original indictment, and three counts of interstate transportation of stolen property.

converted, and taken by fraud".[10] Appellants contend that this "uncontrolled use of superseding indictments" violated due process of law and prejudiced their ability to prepare adequately for trial. Specifically, they argue that this procedure caused the grand jury to consider the evidence in piecemeal fashion rather than in total, was used as a "judge-shopping" device, was used to avoid the time constraints of a prior court order,[11] allowed the Government to present an entirely new case under the guise of a superseding indictment, and deprived appellants of adequate notice of the charges in sufficient time to prepare a defense. We find no merit in any of these contentions.

The second and third indictments obviously increased the scope of the prosecution initiated by the first indictment, but this does not constitute a violation of due process unless appellants were prejudiced. The only allegation of prejudice is that appellants were not afforded sufficient time to prepare a defense. The record does not support this contention. Appellants were apprised of the Government's intention to supersede on March 24, 1975 and they were arraigned on the superseding indictment on April 7. Counsel for appellants was advised on April 21 that a second superseding indictment would be returned to amend the technical defects in counts two through four. Trial on the final indictment began on August 26, 1975. Thus, appellants were fully informed of the charges against them over four months before their trial.

## B. Bill of Particulars

■ Pursuant to appellants' motion, the court entered an order on May 22, 1975, requiring the Government to disclose, within 20 days, titles of all films referred to as overt acts in the conspiracy count which were not specified. The Government did not file a bill of particulars. At trial the Government offered evidence of sales of additional films to show intent on a theory of common scheme or plan, although Government counsel also referred to the sales as "additional overt acts in furtherance of the conspiracy". In any event, on August 15, 1975, eleven days before trial, the Government gave appellants' counsel a list of the dates when the additional sales took place and copies of shipping documents corroborating the sales.[12]

Under these circumstances, we find no prejudice to appellants. The function of a bill of particulars is to enable the accused to prepare for trial and to prevent surprise. *United States v. Murray*, 297 F.2d 812, 819 (2 Cir. 1962), *cert. denied*, 369 U.S. 828, 82 S.Ct. 845, 7 L.Ed.2d 794 (1962). The appellants were furnished the information eleven days before trial and were not surprised when it was offered in evidence. Moreover, the evidence referred to records of appellants and was ascertainable by them long before trial. We conclude that there was substantial compliance with the order for a bill of particulars and the district court did not abuse its discretion in admitting this evidence.

■ Appellants contend further that the court erred in admitting the evidence without a limiting instruction. However, no request was made for a limiting instruction when the evidence was presented, and appellants thereby waived their objection. The failure to give the instruction in the absence of a request was not "plain error".

10. Drebin and Budget Films were arraigned on the first indictment on March 24, 1975. All of the appellants were arraigned on the second indictment on April 7, 1975. Appellants were never arraigned on the final indictment, but proceeded to trial on August 26, 1975, without objection.

11. In a civil action brought by Budget Films to recover the films seized during the F.B.I. search, the district court entered an order requiring all property seized to be returned to Budget unless an indictment was returned before 5:00 p. m. on February 18, 1975.

12. The Government was not aware of these sales until late July or early August, when they learned from the purchasers from South Africa that the additional sales had been made.

*United States v. Rothman*, 463 F.2d 488, 490 (2 Cir. 1972), *cert. denied*, 409 U.S. 956, 93 S.Ct. 291, 34 L.Ed.2d 231 (1972). The evidence was properly admitted as proof of a common plan or scheme. F.R.Evid. 404(b).

### III. Sufficiency of the Evidence

#### A. Criminal Copyright Infringement

■ Appellants contend that the evidence was insufficient to prove a violation of 17 U.S.C. § 104 because the Government failed to prove that the film prints specified in the indictment had not been the subject of a first sale.[13] This court held in *United States v. Wise*, 550 F.2d 1180, 1190 (1977) that:

> It is clear that the Government's burden of proof of criminal copyright infringement is threefold: (1) infringement of a copyright (2) done willfully and (3) for profit. Implicit in its burden of proof on infringement by vending is the duty to prove the absence of a first sale as to those copyrighted articles which the defendant is charged with infringing.

We noted that "the first sale doctrine provides that where a copyright owner parts with title to a particular copy of his copyrighted work, he divests himself of his exclusive right to vend that particular copy" and his vendee "is not restricted by statute from further transfers of that copy". *Id.*, at 1187. In light of the principles set forth in *Wise* and cases discussed therein, we examine the evidence presented at trial.

#### 1. License Agreements

■ As noted *supra*, representatives of the copyright proprietors of each motion picture film listed in the indictment testified that their films had never been sold, but were only licensed in the various areas for distribution and exhibition. The license agreements for the films in each area of distribution were introduced in evidence. In analyzing these agreements, we find that they are in fact licenses and not sales.

Since no purpose would be served in detailing the provisions of each agreement, we find it sufficient to state that all the agreements purported to transfer only limited rights for the distribution and exhibition of the films for a limited time. All required return of the films at the end of the license period, and nearly all reserved title to the films in the copyright owner. Of those contracts which did not reserve title, none contained terms which were inconsistent with the theory of a limited license. "The mere failure to expressly reserve title to the films does not require a finding that the films were sold, where the general tenor of the entire agreement is inconsistent with such a conclusion". *Wise*, 550 F.2d at 1191. The agreements also generally prohibited the licensee or any person from copying or duplicating any film print. Having reviewed the license agreements, we conclude that none constituted first sales.

■ The defense attempted to prove that motion pictures are generally bought and sold. Testimony was elicited, both on cross-examination of Government witnesses and from defense witnesses, that certain films had been sold in the past by copyright owners. However, none of these films were listed in the indictment. This evidence was insufficient to prove that any of the charge films had been subject to a first sale. The evidence might be relevant on the element of willfulness, which appellants do not challenge.

#### 2. V.I.P. Contracts

■ Of the films listed in the indictment, the evidence revealed only six which had been the subject of V.I.P. license agreements. "Paper Moon" was "lent" to Peter Bogdanovich by Paramount Pictures Corporation under an agreement which reserved title to the print in Paramount. Columbia Pictures licensed "The New Centurions", "Shamus" and "The Hireling" to several

---

**13.** This contention challenges the sufficiency of the proof of infringement. Appellants do not challenge the sufficiency of the evidence or the other elements of the crime—willfulness and for profit.

V.I.P.'s under an agreement reserving all rights to the motion picture photoplays in Columbia. CBS Television licensed several episodes of "Hawaii Five-O" to V.I.P.'s, reserving title to the prints. "Hot Rock" was "loaned" to three persons by Twentieth Century Fox Corporation. All of the agreements restricted use of the subject prints to home showings, prohibiting any commercial use of the films. The prints were required to be returned upon request of the studios or, in some cases, upon the death of the licensee. Nearly all the agreements also prohibited the copying or lending of the subject print. None of the V.I.P. agreements constituted a first sale.

*3. Salvage*

■ Studio representatives testified that worn-out films are sold to salvage companies, where the film is either burned, chopped up, washed to remove the images, or cut up and sold as picture leader. Representatives of salvage companies testified that, pursuant to contracts with the studios, their companies destroy worn-out film and issue certificates of destruction to the studios. They also testified that their companies do not resell full-length motion picture films.

Appellants attempted to prove that salvage companies resell reels of film with the images intact as "fill leader". The defense theory was that anyone could purchase fill leader from the salvage companies, assemble a full-length motion picture, and resell it. No copyright violation could result from this procedure since the film had been first sold to the salvage company. Appellants argued, as they do here, that the Government therefore failed to prove the absence of a first sale beyond a reasonable doubt.

Appellants entered in evidence as exhibits two boxes, containing over 40,000 feet of film, purchased from Film Salvage Company,[14] the only salvage company which deals directly with the studios. Part of the film was identified as being from the motion picture "Dillinger" (16 mm) and was projected in court.[15] Several boxes of film purchased from Film Converter Company, another salvage company, were also introduced in evidence. Testimony indicated that the boxes of film contained, in addition to portions of "Dillinger", portions of the television series "Dragnet", "S.W.A.T." and "Hennessy" and the television productions "Christmas Spirit" and "Fourteen Going on Sixteen".

Relying upon isolated portions of the testimony of salvage company witnesses, appellants make a plausible argument that the films might have come from salvage. The testimony of the salvage company witnesses is quite ambiguous, due in part to the fact that on both direct and cross-examination it was elicited largely through leading questions.[16] When viewed as a whole, however, we find the evidence sufficient to prove that appellants did not obtain from salvage the films which they are charged with infringing.

Testimony of the salvage company representatives indicated that they sell fill leader only in strips ranging from 150 to 300 feet in length, making it nearly impossible for anyone to piece together a complete motion picture. The manager of Film Salvage Company testified that the movie studios never sell complete films to his company. He also testified that Film Salvage Company sells fill leader to only approximately five companies which have legitimate need

14. The film was purchased by Charles Parker, the finance of Drebin's daughter. The purchase was made in the name of Hollywood Film Exchange, Venezia's employer.

15. The infringement of "Dillinger" was charged in overt act ten of the conspiracy count.

16. The salvage company witnesses were called by the defendants although apparently they had been subpoenaed by both parties. On the whole their evidence was more favorable to the Government than to appellants.

of the leader for "editorial purposes".[17] Film Salvage does not sell fill leader to any "individual [who comes] in off the street . . . ." Film Salvage had never sold any film to appellants, nor had Film Converter Company.

While the defense testimony regarding the purchase of portions of "Dillinger" from Film Salvage Company is favorable to the defense theory, it is inconclusive and insubstantial. The witness who purchased the film was uncertain whether the entire movie was contained in the purchased film. Furthermore, an executive of American International Pictures, Inc., the copyright owner of "Dillinger", testified that A.I.P. had never sent a 16 mm copy of that film to Film Salvage for junking. The Vice President of Film Treat Company, a corporation that rejuvenates A.I.P. 16 mm films, testified that his company never sent Film Salvage any 16 mm copies of "Dillinger".

We conclude that there was sufficient evidence on which to find appellants guilty of criminal copyright infringement.

**B. Interstate Transportation of Stolen Property**

**1. "Property Stolen, Converted or Taken by Fraud"**

■ Conviction under 18 U.S.C. § 2314[18] requires proof that the property transported was "stolen, converted or taken by fraud". Appellants contend first that the Government's evidence on this point was insufficient for the same reasons urged in regard to criminal copyright infringement—that the evidence was insufficient to prove that none of the films had ever been sold. For the reasons stated, we conclude that the evidence on this point was sufficient. Moreover, the Government need not establish the stolen character of the goods by direct evidence. *United States v. De Kunchak*, 467 F.2d 432, 436 (2 Cir. 1972).

**2. Value of Goods**

Nor do we find merit in appellants' second contention that the Government failed to prove a value of $5,000 or more. In the first place, studio representatives testified that the cost of production and revenues received from each of the movies and television series charged in the indictment exceeded one million dollars.

■ Additionally, there was substantial evidence of the films' value on a "thieves' market". Peter Theologo testified that on June 20, 1974, he purchased one hundred episodes of the television series "Big Valley" from Budget Films, Drebin, and Fine for $5,500.[19] In early June, 1974, he purchased seventeen episodes of "Judd For The Defense", one episode of "Mission Impossible", one episode of "O'Hare" and approximately one hundred episodes of "Big Valley", for which he paid a total of $9,200. Of the four series involved, "Big Valley" and "O'Hare" were charged in the indictment. The jury could reasonably have inferred from this testimony that the one hundred episodes of "Big Valley" and one episode of "O'Hare" were worth in excess of $5,000. Finally, John Holmes testified that on September 11, 1974, he purchased eighty-one films from Budget Films, Drebin, and Fine for which he paid over $14,000. Of the eighty-one films, forty-six were named in the indictment, again allow-

---

**17.** The "editorial purpose" for which the leader is used is to splice the leader to good film so that it can be wrapped around the good film on a reel to protect it. The images are left on the leader to make splicing simpler.

**18.** 18 U.S.C. § 2314 provides in pertinent part: Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; . . .

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both. . . .

**19.** The value of the films in each count could properly be aggregated to satisfy the $5,000 requirement, since their transportation was charged as a single offense. *Schaffer v. United States*, 362 U.S. 511, 517, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960).

ing the jury to infer that the value exceeded $5,000. The evidence provided ample proof of value in excess of the jurisdictional amount.

### C. *Venezia's Conviction on Conspiracy Count*

■ Venezia argues that the Government failed to prove that he was a part of the conspiracy.[20] He contends that the evidence established nothing more than that he was a customer of Budget Films, who bought and sold films to Budget. When viewed in the light most favorable to the Government the evidence shows much more.

Unindicted co-conspirator Katz testified that in November, 1974, Venezia offered to sell him a package of television films that "Budget Films had . . . stored away", which Katz purchased for $8,000. During the same period, Venezia offered to sell Katz a copy of the motion picture "Golden Needles", which Venezia said was stored at Budget Films. Venezia drove Katz to Budget Films, went inside, came out with a copy of the film and gave it to Katz. On one occasion Venezia warned Katz that the Federal Bureau of Investigation was investigating copyright violations. During an interview with two F.B.I. Special Agents, Venezia made the false exculpatory statement that he had never sold films to Harry Katz. This evidence was sufficient to establish Venezia as a member of the

conspiracy.[21] See *United States v. Knight*, 416 F.2d 1181 (9 Cir. 1969).

### IV. Instructions

### A. *Criminal Copyright Infringement*

■ The district court instructed the jury on the first sale doctrine as follows:

"Now, the clause in that statute [17 U.S.C. § 27][22]—and I quote—'the possession of which has been lawfully obtained' as used in that statute means that title and ownership has passed to the one who has obtained possession lawfully.

"The statute I have just read to you incorporates what is commonly referred to as the 'first sale' doctrine. Under that doctrine, if the copyright proprietor transfers title to another party of his copyrighted protected (sic) work, that other party is then free to sell the specific work transferred . . . ."

In giving the instruction, the court relied on Judge Friendly's comments in *Platt & Munk Co. v. Republic Graphics, Inc.*, 315 F.2d 847 (2 Cir. 1963). *Platt & Munk* involved a civil action for injunction by the copyright holder (Platt & Munk) on several educational toys against the company which had contracted to produce the toys. Platt & Munk had refused to pay for the toys because of alleged manufacturing defects, whereupon the manufacturer attempted to sell them to a third party. The court held that such sale would infringe the copyright

**20.** Venezia's role in the alleged conspiracy was described in the indictment:

"The defendant BRUCE M. VENEZIA was furnished information by ALBERT C. DREBIN and LAWRENCE S. FINE concerning the inventory of 'pirated' films available for sale and stored at Budget Films, Inc., and acted in the capacity of a salesman of these 'pirated' films on behalf of Budget Films, Inc."

**21.** *United States v. Falcone*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940), relied on by appellants, is factually distinguishable. There, the only relationship between the defendants and other conspirators was that the defendants furnished raw materials to the conspirators, knowing that they would be used in the production of illicit distilled spirits. Here, Venezia

was directly involved, as indicated by his conduct, in the conspiracy to illegally sell copyrighted motion pictures.

**22.** 17 U.S.C. § 27 provides in pertinent part:

". . . but nothing in this title shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained."

As noted in *United States v. Wise, supra*, this court recognized that, "Although the statute speaks in terms of a transfer of possession, the judicial gloss on the statute requires a transfer of title before a 'first sale' can occur". 550 F.2d at 1187.

since "mere possession" of the copyrighted property did not carry with it the right to sell the property under 17 U.S.C. § 27. Rather, a transfer of title or ownership was necessary to terminate the copyright protection. 315 F.2d at 851–853.

Appellants contend that the instruction was erroneous because the words of the statute require only a transfer of possession, not title, to terminate copyright protection against unauthorized vending. Appellants argue that the statute must be strictly construed in a criminal prosecution and rely on *United States v. Wells*, 176 F.Supp. 630 (S.D.Tex.1959) as supportive of their position.

While the statute speaks in terms of a transfer of possession, the cases have consistently construed § 27 to require a transfer of title or ownership, rather than mere possession, before copyright protection is terminated. *Harrison v. Maynard, Merrill & Co.*, 61 F. 689, 691 (2 Cir. 1894); *Independent News Co. v. Williams*, 293 F.2d 510, 517 (3 Cir. 1961); *Platt & Munk, supra.* Nor does *United States v. Wells* support appellants. *Wells* was a prosecution for criminal copyright infringement for the unauthorized sale of aerial survey maps, the copyright on which was held by Edgar Tobin. Tobin had licensed "negatives" of his maps to 107 customers with the right to reproduce copies of the maps for their own use, but restricting the right to sell copies. The defendant, one of the 107 customers, sold one of the maps. The court noted that: "The present case involves the relationship between the copyright proprietor and his licensee, which seems to lie between the two clear examples of the purchase and mere possession relationships." 176 F.Supp. at 634. "The pivotal issue is whether *title* to the particular copy has been retained by the copyright proprietor or has passed to a first purchaser." 176 F.Supp. at 633 (emphasis added). The court held that "[s]ince the Tobin license does not specify that all copies published thereunder remain the property of the copyright proprietor, it fol-

lows that *title* to all copies published under the license belongs to the licensee", thereby terminating the copyright protection against the vending of the copies. 176 F.Supp. at 634 (emphasis added). Thus, although *Wells* did not involve a sale situation, the court nevertheless regarded the transfer of title as the *sine qua non* of the first sale doctrine. *Wells* is consistent with *Platt & Munk* and the weight of authority. The court's instruction was proper.

■ Appellants also challenge the refusal of the district court to give several of their proposed instructions. Appellants' Proposed Instruction 31A, based on Uniform Commercial Code § 2–403, stated:

Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entrustor to a buyer in ordinary course of business.

Appellants contend that the instruction was supported by *Independent News Co. v. Williams, supra.* From the preceding discussion, however, it is clear that the instruction was properly refused since mere possession is insufficient to invoke the first sale doctrine. *Independent News* is distinguishable. In that case the applicability of the Uniform Commercial Code was discussed, not in connection with copyright infringement, but in connection with a claim of conversion. The court, in discussing the claim of copyright infringement, found the first sale doctrine applicable, not on the basis of the Uniform Commercial Code, but because title to the goods had passed from the copyright owner. Defendants' Proposed Instruction 31A was properly refused.

Appellants contend that the court erred in refusing to give their proposed instructions 31D and 30B, concerning the transfer of title to prints sold to salvage companies. Citing *Harrison v. Maynard, Merrill & Co., supra,* and *Independent News, supra,* appellants argue that transfers of worn-out film prints to salvage companies are, in effect, sales which transfer title to the prints to the salvage companies. While appellants

are correct,[23] their proposed instruction 31D was a misstatement of the law. It stated in part that the right to restrain the sale of particular film prints under the copyright law ceases ". . . when the owner of a copyright and of the copy has parted with his *possessory* rights thereto". [Emphasis added.] Instruction 31D was premised on the false assumption that a transfer of possession activates the first sale doctrine, and was properly refused.

Instruction 30B [24] was based on sections 2106(1) and 2401(2) of the California Commercial Code and concerned the passage of title in a sales transaction. Appellants contend that the refusal of the court to instruct the jury that the legal effect of sales to salvage companies was the passage of title was "fatal to the main defense presented by the defendants". However, the court did instruct the jury that "[a] sale occurs when the seller transfers to the buyer the title and possession of property for a price which may be paid in installments or in a lump sum". This instruction was sufficient to inform the jury that a sale involves the passage of title. Instruction 30B was properly refused.

## B. Interstate Transportation of Stolen Property

Appellants argue that the court erred in its instruction defining "value" under 18 U.S.C. § 2311. The court instructed the jury that:

The Government must establish beyond a reasonable doubt in Counts 2 through 4 that the value of the stolen goods, wares, and merchandise was in excess of $5,000.00.

Value means the face, par or market value, whichever is greatest, and the aggregate value of all goods, wares and merchandise in a single count of the Indictment shall constitute the value thereof.

Market value usually refers to what a willing buyer would pay a willing seller. But if you find that the type of goods, which are the subject matter of this indictment, have no market value, then you may consider any reasonable method to ascribe an equivalent monetary value to them.

Appellants contend that the instruction was erroneous because the court did not limit the definition of value to market value, arguing that the jury was thereby allowed to arbitrarily choose any method of valuation it desired. They also argue that ample evidence of a market existed, consisting of a substantial number of film collectors.

We conclude that the court's instruction was proper. It was phrased in terms of 18 U.S.C. § 2311 [25] and of language approved in *United States v. Lester*, 282 F.2d 750 (3 Cir. 1960). The Third Circuit in *Lester* held that where goods have no readily ascertainable market value, "any reasonable method may be employed to ascribe an equivalent monetary value to the items". 282 F.2d at 755.[26] While there was some evidence of a market for films among collectors, this was essentially a "black market", and there was

23. The court did instruct the jury that if it found that "the title to any of the prints involved in the Indictment passed to the licensee or salvage company", it should find that the prints as to which title passed had been sold, and lacking protection of the copyright laws there could be no infringement and the defendants should be acquitted.

24. *Defendants' Proposed Instruction 30B read:*
A "sale" consists in the passing of title from the seller to a buyer for a price. Unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods.

25. 18 U.S.C. § 2311 states in pertinent part:
"Value" means the face, par, or market value, whichever is the greatest, and the aggregate value of all goods, wares, and merchandise, securities, and money referred to in a single indictment shall constitute the value thereof.

26. *Abbott v. United States*, 239 F.2d 310 (5 Cir. 1956) and *United States v. Nall*, 437 F.2d 1177 (5 Cir. 1971), relied on by appellants as supportive of a strict market value instruction, are not persuasive. As noted in *Lester*, 282 F.2d at 755, the court in *Abbott* recognized that the $5,000 value requirement was intended to limit the federal sanction to the theft of things having a "substantial value". To the extent that

no evidence that the prices paid reflected the actual worth of the films.

Finally, appellants contend that the court erred in refusing to give their proposed instructions 17A and 19A, to the effect that motion picture photoplays are intangibles and cannot be considered "goods, wares or merchandise" under 18 U.S.C. § 2314. It is argued that "a copyright is an intangible property right, separate and distinct from any property right in the tangible item from which such copies may be made". Appellants also contend that a copy cannot be acquired by theft, conversion or fraud within the meaning of § 2314 because a copyright owner has no proprietary interest in duplicates of his work. These contentions are both illogical and contrary to law. Copies are considered goods or merchandise for purposes of the statute. *United States v. Seagraves*, 265 F.2d 876, 880 (3 Cir. 1959). Moreover, illicit copying of a copyrighted work is no less a "theft, conversion or taking by fraud" than if the original were so taken. See *United States v. Bottone*, 365 F.2d 389 (2 Cir. 1966).[27]

### IV. Prosecutorial Misconduct

Appellants contend that they were denied a fair trial by comments made by the prosecutor which inflamed the jury and by the prosecutor's improper cross-examination of defense witnesses. It is argued that the jury was inflamed by the prosecutor's statement in final argument that the movie industry was losing hundreds of thousands of dollars in revenue annually through unauthorized sales of motion picture films. However, this comment was fully supported by the evidence and was not objected to by appellants. The prosecutor also referred to appellants and their sales of film as "pirates" and acts of "piracy". The word "pirate" and its variations have come to be used synonymously with acts of infringement. 17 U.S.C. §§ 106 and 107 refer to "piratical" words, and the words "pirate" and "piracy" have been used by courts synonymously with infringement. See *e. g., Goldstein v. California*, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973); *Duchess Music Corporation v. Stern*, 458 F.2d 1305 (9 Cir. 1972). We conclude that the prosecutor's comments were proper.

During cross-examination of Budget's bookkeeper, Government counsel asked her: "Isn't it a fact that the defendant, Albert Drebin, destroyed many of the documents regarding sales prior to the search that was conducted?". No objection to the question was made by defense counsel. No evidence was presented by the Government to corroborate the implication present in the question. While the question exceeds the bounds of proper cross-examination, it concerned a collateral point in the case (an inconsistency between the testimony of the bookkeeper and the F.B.I. agents who searched Budget) and was not plain error.

The prosecutor, during cross-examination of another defense witness, asked him whether he had sold a copy of the film "The Exorcist", to which a defense objection of irrelevance was sustained. This question was raised on three later occasions; each time the objection was sustained and the jury admonished to disregard the question. No prejudice to appellants is apparent from these facts since the court properly refused the evidence and admonished the jury.

### VI. Ambiguity of Verdict

Venezia contends that the verdict against him was ambiguous since it did

---

*Abbott* may be inconsistent with *Lester*, we adhere to *Lester*. *Nall* is factually distinguishable since the only evidence of value in that case was the owner's subjective opinion, which the court held was not a reasonable method of determining value.

27. Appellants' contention regarding the insufficiency of the evidence of whether the films sold were originals or duplicates is likewise without merit.

not specify whether he was convicted of a misdemeanor or a felony, both of which were charged in the conspiracy count on which he was convicted. We agree with the Government that the jury's general verdict of guilty is a finding that Venezia was guilty "as charged"—guilty of conspiracy to commit both misdemeanor and felony violations. See *Phillips v. United States*, 264 F. 657, 659 (5 Cir. 1920), *cert. denied*, 253 U.S. 491, 40 S.Ct. 584, 64 L.Ed. 1028 (1920). Moreover, Venezia objected to the use of special verdicts and thereby waived any objection to use of the general verdict. See *United States v. Jones*, 425 F.2d 1048, 1057 (9 Cir. 1970). In any case, we fail to find any prejudice to Venezia since his sentence did not exceed the maximum allowable for a misdemeanor.

## VII. Statute of Limitations

Appellants contend that their convictions on counts two, three, and four (interstate transportation of stolen property in violation of 18 U.S.C. § 2314) are barred because the Government failed to prove that the property was "stolen, converted or taken by fraud" within the applicable statute of limitations, 18 U.S.C. § 3282. This section provides that the indictment must be found "within five years next after [the] offense shall have been committed".

■ It is well settled that a statute of limitations begins to run when "the crime is complete". *Toussie v. United States*, 397 U.S. 112, 115, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970). The crime is complete as soon as every element in the crime occurs. The offense charged is the interstate or foreign transportation of stolen goods. The crime is not complete until the stolen goods are transported. The Government's proof established that the interstate transportation occurred well within five years before indictment was returned. It was not necessary to show that the thefts also occurred within the five year period. See *Mitchell v. United States*, 196 F. 874, 878 (9 Cir. 1912).[28]

## VIII. Collateral Estoppel

■ Appellants argue that their prosecution is barred by the doctrine of collateral estoppel because previous film piracy cases have found that motion picture studios, including some involved in this case, have sold their films.[29] However, the two essential requirements of collateral estoppel are lacking. There is neither identity of issues nor identity of parties between this case and those relied upon by appellants. *United States v. Wise*, 550 F.2d 1180, 1187–1188 (9 Cir. 1977).

Affirmed.

---

**28.** *Carroll v. United States*, 326 F.2d 72 (9 Cir. 1963), relied on by appellants, is distinguishable. Carroll was charged with fraud in the sale of securities. The securities had been purchased and paid for more than five years before the indictment was returned, although the certificates were mailed within the five year period. The court held that mailing the certificates was not the "essence of the offense" and was "merely incidental and collateral to it, and not a part of it", even though the mailing provided the basis for federal jurisdiction. Here the interstate transportation was a necessary element, and part of the "offense" itself, and was completed within the period of the statute of limitations.

**29.** *American International Pictures, Inc. v. Foreman*, 400 F.Supp. 928 (S.D.Ala.1975); *United States v. Nagy* (unreported) (N.D.Ind. 1975).