**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Harold S. McCLINTOCK,**
**Defendant-Appellant.**

No. 82–1480.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 13, 1983.

Decided June 5, 1984.

As Amended Dec. 5, 1984.

1280

John D. Lyons, Jr., Asst. U.S. Atty., Phoenix, Ariz., for plaintiff-appellee.

Larry L. Debus, Debus, Bradford & Kazan, Phoenix, Ariz., for defendant-appellant.

Before KILKENNY, Senior Circuit Judge, SKOPIL and FERGUSON, Circuit Judges.

SKOPIL, Circuit Judge:

Harold S. McClintock appeals his conviction of four counts of mail fraud and aiding and abetting, 18 U.S.C. § 1341 and § 2; two counts of wire fraud and aiding and abetting, 18 U.S.C. § 1343 and § 2; and two counts of interstate transportation of money taken by fraud and aiding and abetting, 18 U.S.C. § 2314 and § 2. We reverse as to three counts and affirm as to the others.

## BACKGROUND

McClintock was indicted for mail fraud, wire fraud, interstate transportation of money taken by fraud, and use of a false name. The indictment arose out of De-Beers Diamond Investment, Ltd. ("DDI") selling gemstones to customers through the mails and by telephone during the years 1974 through 1978.

In essence, the indictment alleged that McClintock, through DDI, engaged in a fraudulent scheme to sell these gemstones.[1] McClintock represented himself as a "consultant" of DDI. He was not designated as a director, officer, or stockholder. Evidence at trial, however, revealed that employees of DDI viewed McClintock as the head of the company. Following trial, McClintock was convicted of eight of the charged counts.

## ISSUES

1. Did the search warrant describe the items to be seized with sufficient particularity?

2. Did the government engage in misconduct sufficiently serious to violate McClintock's constitutional rights or to require reversal under the court's supervisory powers?

3. Was McClintock's prior conviction time-barred and thus improperly admitted?

4. Did the trial court improperly limit cross-examination?

5. Did the district court deny McClintock his sixth amendment right to confront his accusers?

6. Was there a non-unanimous verdict?

## DISCUSSION

### 1. The Search Warrant.

A. Standard of Review

■ We conduct a **de novo** review of search warrants that are challenged for failing to particularly describe the items to be seized. *See, e.g., United States v. Gomez-Soto,* 723 F.2d 649, 652–54 (9th Cir.), cert. denied, — U.S. —, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984); *United States v. Cardwell,* 680 F.2d 75, 77–78 (9th Cir.1982).

B. Analysis

■ In September 1978 the premises of DDI were searched pursuant to a warrant which permitted the seizure of:

Diamonds, emeralds, sapphires, rubies, and other gemstones, as well as books, records, notes, memoranda, telephone records, client lists, purchasers, and prospective purchasers, appraisals, and any and all items referring to the sale of diamonds and other gemstones which are evidence of a violation of Title XVIII, United States Code, §§ 1342 and 1343.

McClintock contends that the warrant failed to describe with sufficient particularity the items to be seized.

The fourth amendment requires that a warrant must "particularly describ[e] the place to be searched and the person or things to be seized." U.S. Const. Amend. 4. Therefore, "general warrants" are prohibited. This is intended to prevent "a general, exploratory rummaging in a person's belongings." *Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976) (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971)). This particularity requirement "prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is [to be] left to the discretion of the officer executing the warrant." *Cardwell,* 680 F.2d at 77 (quoting *Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927)).

McClintock relies primarily on *United States v. Drebin,* 557 F.2d 1316 (9th Cir. 1977), *reh. aff'd in part, rev'd in part on other grounds,* 572 F.2d 215 (9th Cir.), cert. denied, 436 U.S. 904, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978). In *Drebin* we invalidated a broadly worded warrant. We reasoned that "[t]he warrant provided no guidelines for the determination of which films had been illegally reproduced." Id. at 1323. In *United States v. Offices Known as 50 State Distributing Co.,* 708 F.2d 1371 (9th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1272, 79 L.Ed.2d 677

---

**1.** One alleged misrepresentation was that DDI misled prospective customers into believing it was associated with the renowned diamond car- tel of DeBeers Consolidated Mines, Ltd. In fact, DDI was unrelated to the cartel.

(1984), however, we upheld a warrant authorizing the seizure of:

> lead source material, invoices, sales orders, order forms, ... United States Postal Service Money Orders, United States Postal Service C.O.D. firm mailing records, and other evidence and instrumentalities for numerous on-going violations of Title 18, United States Code, Sections 1341 (Mail Fraud), 1342 (Fictitious Names), and 371 (Conspiracy).

*Id.* at 1372.

The outcome of these two cases differed because the facts differed. In *Drebin*, the warrant failed to describe with particularity the property to be seized, labeling it only "illegally reproduced and stolen copies of ... films ...; books, records, papers and other documents ... which are the fruits and instrumentalities of violations of [18 U.S.C. §§ 371 and 2314]" (*id.* at 1322); the warrant thus impermissibly authorized a "general search" unsupported by probable cause. In *50 State*, however, the warrant described with particularity each item to be seized but described many, many items (*id.* at 1374), and it "was justified by the breadth of probable cause [established by the] affidavit." *Id.*

The facts of the present case are more similar to *50 State* than to *Drebin*. Here, the affidavits that the district court considered in granting the search warrant provide probable cause to seize all the items listed in the warrant, and describe with particularity each of the items subject to seizure. For example, the affiants provide probable cause to seize the gems that were the subject of DDI's alleged fraud. They state that: (1) the gems were industrial quality, but were represented as high quality; (2) the gems on DDI's premises often bore no relation to the fictitious gems the DDI salespersons claimed to have in their vault; (3) all the DDI gems were located on a tote board in the plans room; and (4) the seizure was necessary to compare DDI's appraisals with independent appraisals. Similarly, the affiants provide probable cause to seize the business' telephone records, because the affiants state that

telephone solicitation of potential customers was DDI's principal means of accomplishing his alleged fraud. The scheme to defraud is described in detail and supported by numerous statements from within and without the business. The fraud is described as follows:

> One, that the solicitation and sale of precious stones to customers via the telephone and mail wherein DeBeers did not have possession, ownership, nor [sic] control over the gemstones sold. Two, that those persons actually receiving the gemstones also received an appraisal indicating values far in excess of the true worth of the stones.

Swayze affidavit, pp. 2–3. The description is supported by: (1) several customers' anecdotal complaints; (2) the follow-up survey of DDI's customers from 1976 through 1978; (3) independent reappraisals of gems originally appraised under the auspices of DDI; (4) revealing statements of a top DDI salesperson and of a DDI account executive; and (5) the affiant's own test purchase of some gems. Thus, the affidavits in this case provide probable cause to seize all that is described, and the descriptions are particular enough to identify all items subject to seizure.

### 2. Governmental Misconduct.

#### A. Standard of Review

 Because the separation of powers doctrine "mandates judicial respect for the independence both of" the prosecutor and the grand jury, *United States v. Sears, Roebuck & Co., Inc.,* 719 F.2d 1386, 1391 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1441, 79 L.Ed.2d 762 (1984), our review of an indictment is limited. "[A]n indictment may be dismissed only in 'flagrant case[s]' of prosecutorial misconduct." *Id.* (quoting *United States v. Kennedy,* 564 F.2d 1329, 1338 (9th Cir.1977), *cert. denied,* 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978)). We will not hold "prosecutorial discretion" to be violative of due process "unless it is abused to such an extent as to be arbitrary and capricious." *United States v. Samango,* 607 F.2d 877, 881 (9th

Cir.1979) (quoting *United States v. Welch,* 572 F.2d 1359, 1360 (9th Cir.), *cert. denied,* 439 U.S. 842, 99 S.Ct. 133, 58 L.Ed.2d 140 (1978)). There must be "a clear basis in fact and law" for a court to invoke its supervisory powers to dismiss an indictment. *United States v. Chanen,* 549 F.2d 1306, 1313 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977); *but see Sears, Roebuck,* 719 F.2d at 1391, n. 6.

### B. Bankruptcy Records

McClintock was first indicted in June 1979. About that time DDI was undergoing bankruptcy proceedings. The bankruptcy court granted the government's motion for an order directing the bankruptcy trustee to turn over all of DDI's books and records to the United States Attorney. On July 25, 1979 the government wrote to defense counsel and invited them to inspect DDI's records, stating there was "potential *Brady* material in these records." The district court subsequently dismissed the initial indictment without prejudice, finding the government failed to abide by an agreement to disclose "ten files" of other exculpatory material to the grand jury.

The government then invited the defendants to submit exculpatory evidence for possible presentation to a second grand jury. In response, the defendants sought access to DDI's books and records turned over by the bankruptcy trustee. They sought exculpatory material other than that contained in the "ten files." The government denied access to these books and records. The court denied the defendant's motion to compel production of the documents on the ground that the defendant lacked standing during the pendency of grand jury proceedings.

McClintock argues that the government's actions undermined "the integrity of the judicial process." We construe McClintock's argument in two ways: (1) that he has been denied due process of law, and (2) that we should invoke our supervisory powers and dismiss the indictment.

Dismissals based on constitutional grounds or our supervisory powers are premised on distinct though closely related theories. *See Chanen,* 549 F.2d at 1309 n. 2; *Sears, Roebuck,* 719 F.2d 1386, 1394–95 (Norris, J., dissenting). The constitutional ground is hinged to the due process clause of the fifth and fourteenth amendments, and the grand jury clause of the fifth amendment.[2] *Id.* at 1391, n. 7. *Samango,* 607 F.2d at 881 (citation omitted). The "constitutional analysis focuses on preserving fairness for the individual defendant and remedying any harm that has been done to his basic rights." *Sears, Roebuck,* 719 F.2d at 1394 (Norris, J., dissenting). This fairness requires that prosecutorial discretion not be "arbitrary and capricious." *Samango,* 607 F.2d at 881.

■ The supervisory powers theory, on the other hand, is premised on the inherent ability of the federal courts to "formulate procedural rules not specifically required by the Constitution or the Congress." *United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96, 104 (1983). It permits us "to supervise 'the administration of criminal justice' among the parties before the bar." *United States v. Payner,* 447 U.S. 727, 735 n. 7, 100 S.Ct. 2439, 2446 n. 7, 65 L.Ed.2d 468 (1980), *reh. denied,* 448 U.S. 911, 101 S.Ct. 25, 65 L.Ed.2d 1172 (1980) (quoting *McNabb v. United States,* 318 U.S. 332, 340, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943)). In deciding whether to invoke our supervisory powers to dismiss an indictment, we consider the egregiousness of the prosecutor's misconduct and the availability of less drastic sanctions. *See Sears, Roebuck,* 719 F.2d at 1395 (Norris, J., dissenting). In some cases a pattern of misconduct by a particu-

---

**2.** It is not altogether clear whether the constitutional grounds are based on the due process clause or the grand jury clause. *Compare Samango,* 607 F.2d at 881 and *United States v. Basurto,* 497 F.2d 781, 785 (9th Cir.1974) (due process clause) with *Sears, Roebuck,* 719 F.2d at 1391 n. 7 (grand jury clause). We do not find it necessary to state our views on this or attempt to clarify any apparent conflict. We feel that, no matter what clause is used, the analysis and end result are the same.

lar prosecutor or his office may convince us to invoke this power. *See id.* There is primarily a twofold purpose justifying exercise of our supervisory power: deterring illegality and protecting judicial integrity. *Payner*, 447 U.S. at 735, n. 8, 100 S.Ct. at 2446, n. 8; *cf. Hasting*, 461 U.S. at 505, 103 S.Ct. at 1978, 76 L.Ed.2d at 104 (a third purpose is to "implement a remedy for violation of recognized rights").

■ McClintock correctly points out that this case involves more than a failure to disclose exculpatory material.[3] Here, the government refused to allow access to the records despite its knowledge that the bankruptcy court had intended that defense counsel have this access.[4] Based on the government's July 25, 1979 letter to defense counsel, it is apparent that the DDI bankruptcy records possessed exculpatory material. We are disturbed by the government's refusal to allow access to these records, in light of that letter. We are further disturbed by the suggested lack of candor in the prosecutor's assurance to the district court that the "ten files" were the only exculpatory material.

■ We find that, at best, the United States Attorney's behavior skirted his ethical obligations. *See, e.g.,* ABA Standards for Criminal Justice, the Prosecution Function, Standard 3–3.6(d). Behavior of this nature is antithetical to the obligation of the courts and the bar to ensure the just administration of the laws of the United States. The United States Attorneys are entrusted with a unique role that includes "the duty to protect the interests of all people, including, of course, the legitimate

rights of those accused of crime in the federal courts." *United States v. Butler*, 567 F.2d 885, 894 (9th Cir.1978) (Ely, J., concurring). We condemn actions such as these that breach that trust.

Nonetheless, we do not find the prosecutor's conduct so egregious as to amount to a constitutional violation. *Cf. United States v. Bruzgo*, 373 F.2d 383, 386 (3d Cir.1967) (prosecutor "exceeded the bounds of proper conduct" but the court did not find a constitutional violation). Because the prosecutor had no legal obligation to disclose the exculpatory material to the grand jury, *United States v. Al Mudarris*, 695 F.2d 1182, 1185 (9th Cir.), *cert. denied*, 461 U.S. 932, 103 S.Ct. 2097, 77 L.Ed.2d 305 (1983), his actions were not arbitrary or capricious in the constitutional sense. His actions did not "significantly infring[e] upon the ability of the grand jury to exercise its independent judgment." *United States v. Cederquist*, 641 F.2d 1347, 1353 (9th Cir.1981).

We also decline to invoke our supervisory power to reverse the district court. First, we recognize the possibility of an ambiguity in the bankruptcy court order. We note in particular that the formal order, unlike the minute entry, did not contain a provision that defense attorneys have access to these records. Accordingly, we do not find "a **clear** basis in fact," *Chanen*, 549 F.2d at 1313 (emphasis added), to invoke our supervisory power. Second, we do not find the apparent ethical violations to be so flagrant that reversal is required to protect the integrity of the judicial sys-

---

**3.** We reject any argument that the indictment should be dismissed for failure of the prosecutor to present exculpatory material to the grand jury. The prosecution has no such legal obligation. *United States v. Al Mudarris*, 695 F.2d 1182, 1185 (9th Cir.), *cert. denied*, 461 U.S. 932, 103 S.Ct. 2097, 77 L.Ed.2d 305 (1983); *United States v. Kennedy*, 564 F.2d 1329, 1338 (9th Cir.1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1526, 55 L.Ed.2d 541 (1978).

**4.** The government concedes in its brief that the minute entry reveals that the bankruptcy court "did instruct that something be inserted in the order for turnover." The government then,

however, states that what the court meant by that is unclear and that that was not made part of the formal order signed by the court.

We find it difficult to believe that the government did not understand the intention of the bankruptcy court. The order stated, in pertinent part:

Mr. Silver, United States Attorney, Trustee, and Mr. Jones will have access to these as well as the defense attorneys.

Mr. Sacks also added that if any defense attorney wishes to review the records, they would be accompanied by a agent [sic] and there is a log kept.

tem. *See Payner*, 447 U.S. at 735 n. 8, 100 S.Ct. at 2446 n. 8. The ABA properly imposes ethical standards "far stricter than those administered by the courts." *United States v. Trass*, 644 F.2d 791, 797 (9th Cir.1981). Despite our grave concerns over these actions by the U.S. Attorney's office, we conclude they fall short of requiring reversal based on our supervisory power. *See id.; see also Sears, Roebuck*, 719 F.2d at 1392. We caution the U.S. Attorney's office not to misconstrue these admonitions as possessing a hollow ring.

## C. Grand Jury Subpoenas

■ McClintock further claims that during the second grand jury proceedings the government used subpoenas to obtain private interviews with former DDI employees and exerted undue influence upon the witnesses. Apparently FBI agents took part in some of the interviews. He further claims the grand jury subpoenas were abused because federal agents met with the witness the night before the prosecutor interviewed the witness. McClintock presented affidavits of grand jury witnesses to support his claims. The government submitted affidavits from the involved FBI agents who denied the accusations.

We are unable to conclude that there has been overreaching or deception of the grand jury "in some significant way." *Samango*, 607 F.2d at 882. First, the United States Attorney did not improperly use a grand jury subpoena to conduct his own investigation. This case is unlike *Durbin v. United States*, 221 F.2d 520 (D.C.Cir. 1954), a case on which McClintock relies. In *Durbin*, the U.S. Attorney admitted that because he was not satisfied with a witness's statement he did not take the wit-

ness before the grand jury. *Id.* at 522. Counsel for McClintock admitted that anyone who received a grand jury subpoena and wanted to testify was taken before the grand jury. Second, counsel also admitted that FBI agents were removed from the interview room when a witness objected to their presence. Finally, we have scrutinized the affidavits in vain for a statement that the conduct of the agents influenced the statements made by any witness.[5]

## D. Failure to Disclose Exculpatory Material

Included in his governmental misconduct claim is McClintock's contention that the government failed to comply with court ordered disclosures. We now consider each alleged violation.

■ McClintock claims the government did not respond to his request for Rule 16 and *Brady* materials until three weeks before trial, when it provided a "filing cabinet" full of documents for the defendants to review. The district court granted McClintock a continuance to allow review of this material. It expressed an open mind in allowing more time for McClintock to review the material. Although the government should have responded sooner, McClintock has established no prejudice from this delay.

■ McClintock claims that the government failed to disclose a grant of immunity given to Lois McDonnell, a prosecution witness. If "the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within" the rule enunciated in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Giglio v.*

---

5. We feel compelled to comment on another disturbing aspect of this case. A common thread in all the affidavits by the witnesses is an allegation of questionable conduct on the part of the government. For example, the FBI agents frequently contacted the witnesses during late night hours. Also, some of the witnesses either met with, or were asked to meet with, the FBI agents at bars. While based on the facts of this case we are unable to conclude that there was overreaching, we do not condone this behavior of the United States Attorney's Office or of the FBI. We caution governmental agencies to adhere to the ethical standards a citizen would expect from people in their positions. *Accord United States v. Butler*, 567 F.2d 885, 892 (9th Cir.1978) (Ely, J., concurring) (government is responsible for the conduct of its agents, as agents are "an arm of the prosecutor") (quoting *United States v. Morell*, 524 F.2d 550, 555 (2d Cir.1975).

*United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (quoting *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)). McClintock rests his argument on Exhibit CH, which was sealed at trial. This document does not support McClintock's claim. It does not mention McDonnell by name and states that a "subject" had been arrested and wished to "deal the charges by providing information relating to" DDI. It does not show the existence of an immunity agreement. We hold that this exhibit was not "evidence affecting credibility," and therefore its nondisclosure was not error. *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766.

McClintock further contends that McDonnell was in fact granted immunity and that the United States Attorney's Office took part in the dismissal of the state charges against her. Assuming the truth of this claim, we are not convinced that the reliability of McDonnell "may well be determinative of guilt or innocence." *Giglio,* 405 U.S. at 154, 92 S.Ct. at 766 (quoting *Napue,* 360 U.S. at 269, 79 S.Ct. at 1177). McDonnell was not a "key witness" such as the co-conspirator in *Giglio,* 405 U.S. at 151, 92 S.Ct. at 764. Our review of the record reveals significant other evidence upon which this conviction was based.

■ McClintock's next argument pertains to a taped conversation the government did not disclose. During cross-examination of Postal Inspector West, McClintock's counsel discovered that West made a tape of a telephone conversation he had with Vern Hackett, a DDI salesperson. This tape contains accurate statements made by the salesperson concerning DDI's business operations. McClintock claims the failure to disclose this tape despite earlier requests for exculpatory material amounts to a violation of the *Brady* doc-

trine. The recording indicated only that DDI did not always engage in fraudulent practices. It did not constitute *Brady* material. It did not support an inference that McClintock, through DDI, did not defraud the victims in this case. The recorded conversation did not "tend to exculpate" McClintock.[6] *Brady,* 373 U.S. at 88, 83 S.Ct. at 1197.

Considered together, we do not find that these alleged abuses of discovery approach a flagrant case of governmental misconduct amounting to a deprivation of due process. *Cf. United States v. Ryan,* 548 F.2d 782, 789 (9th Cir.1976), *cert. denied,* 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977) (government's conduct must be "so grossly shocking and so outrageous as to violate the universal sense of justice" to justify dismissal of case on due process grounds).

### 3. Time-Barred Conviction.

#### A. Standard of Review

■ The district court's construction of the Federal Rules of Evidence is a question of law subject to *de novo* review. *See United States v. Bagley,* 537 F.2d 162, 165–66 (5th Cir.1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 816, 50 L.Ed.2d 794 (1977).

#### B. Analysis

In December 1967 McClintock was convicted of mail fraud, stemming from his activities as a professional fund raiser for a charitable organization. Sentence was withheld, and McClintock was placed on five years probation. As a condition of probation, McClintock was ordered not to engage in professional charitable fund raising. In January 1972 his probation was revoked for violation of this condition. He was sentenced to a term of three years and

---

**6.** Even if this tape was *Brady* material, the government's failure to disclose it did not constitute reversible error. McClintock made a general request for *Brady* material as opposed to a specific request for these tapes. *Compare United States v. Agurs,* 427 U.S. 97, 107, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976) (general request), with *Brady,* 373 U.S. at 87, 83 S.Ct. at

1196 (specific request); *see United States v. Goldberg,* 582 F.2d 483, 488–90 (9th Cir.1978), *cert. denied,* 440 U.S. 973, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979). Disclosure of this evidence did not "create[ ] a reasonable doubt that did not otherwise exist." *Agurs,* 427 U.S. at 112, 96 S.Ct. at 2402.

was paroled in February 1973. Trial on the present charges began on January 8, 1982.

McClintock contends that the district court improperly denied a motion **in limine** to preclude use of this prior conviction because: (1) his conviction was more than ten years old and thus time-barred; (2) the prejudicial effect outweighed the probative value; and (3) the district court failed to make sufficient findings to support its decision. We disagree.

This situation is governed by Fed.R.Evid. 609. That rule provides that the credibility of a witness may be attacked during cross-examination by establishing that he has been convicted of a crime. Fed.R.Evid. 609(a). The crime must have: (1) "involved dishonesty or false statement" or (2) "been punishable by death or imprisonment in excess of one year" with the probative value of the evidence outweighing its prejudicial effect. *Id.* Evidence of a conviction is not admissible if

> more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

Fed.R.Evid. 609(b).

The district court concluded that McClintock's 1967 conviction was a crime involving "dishonesty or false statement" and was not more than ten years old within the meaning of Fed.R.Evid. 609(b). The court determined that the prison term that followed the 1972 revocation of McClintock's probation was "confinement imposed for" the 1967 mail fraud conviction. It relied on *United States v. Brewer*, 451 F.Supp. 50 (E.D.Tenn.1978), which held that "reconfinement pursuant to parole revocation is 'confinement imposed for [the original] conviction.' " *Id.* at 53.

■ At the outset we note that a mail fraud conviction is a crime involving "dishonesty or false statement" within the

meaning of Fed.R.Evid. 609(a)(2). *United States v. Brashier*, 548 F.2d 1315, 1326–27 (9th Cir.1976), *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977). *See United States v. Smith*, 551 F.2d 348, 361–65 (D.C.Cir.1976) (discussing meaning of phrase "dishonesty or false statement"). Because mail fraud falls within Fed.R.Evid. 609(a)(2), the district court was not required to make findings that the probative value of the evidence outweighed the prejudicial effect. Thus, if the prior conviction is not more than ten years old within the meaning of Fed.R.Evid. 609(b), it was admissible.

Whether confinement pursuant to a probation revocation is confinement imposed for the original conviction within the meaning of Rule 609(b) is a question not yet addressed in this circuit. The statute is silent on this question. We are aware of no court that has considered this precise issue. This case, however, involves only a narrow variant of this issue. McClintock's probation was revoked for violation of a substantive condition—his failure to refrain from engaging professionally in charitable fund raising—that directly paralleled his original crime—engaging professionally in fraudulent charitable fund raising. The original crime of which McClintock was convicted involved dishonesty or false statement. The probation violation, because it so directly tracked the original crime, may have implicated the same, initial type of dishonesty.

■ *Brewer* held that "reconfinement pursuant to parole revocation is 'confinement imposed for' [the original] conviction." *Brewer*, 451 F.Supp. at 53. We see no reason why that rationale should not extend to confinement pursuant to probation revocation, where the violation involved a substantive probation condition and closely parallels the initial, fraudulent activity.

Other considerations besides the narrow facts of this case compel us to rule narrowly. The nature of Fed.R.Evid. 609(a)(2)—creating an irrebuttable presumption that

prior crimes "involv[ing] dishonesty or false statement, regardless of punishment" are admissible—also compels us to restrict our holding to these facts. Faced with a different question, a District of Columbia circuit court discussed the limits of the "dishonesty or false statement" category. The court held that the category did not include petit larceny, a holding inapplicable to McClintock's prior conviction for mail fraud, which is included in that category. But the court reasoned:

> Rule 609(a)(2) is to be construed narrowly; it is not **carte blanche** for admission on an undifferentiated basis of all previous convictions for purposes of impeachment; rather, precisely because it involves no discretion on the part of the trial court, in the sense that all crimes meeting its stipulation of dishonesty or false statement must be permitted to be used for impeachment purposes, Rule 609(a)(2) must be confined ... to a "narrow subset of crimes"—those that bear **directly** upon the accused's propensity to testify truthfully.

*United States v. Fearwell*, 595 F.2d 771, 777 (D.C.Cir.1978) (emphasis in original; citation omitted). We decline to hold that a district court may never look behind the circumstances of a probation violation to see if it was substantial or technical, dishonest or honest. Such a blanket rule would create the **carte blanche** against which the District of Columbia circuit warned. We hold only that confinement imposed for substantive probation violations that implicate the original dishonest activity is "confinement" for the original offense within the meaning of 609(b). This narrow holding creates no converse blanket rule excluding evidence of confinement based on technical violations or violations not implicating the original dishonesty. It simply makes the admissibility of the conviction upon which that confinement is based subject to 609(b)'s weighing of probative value against prejudicial effect.

Another appellate court was faced with a different but related question. In *United States v. Mullins*, 562 F.2d 999 (5th Cir. 1977), *cert. denied*, 435 U.S. 906, 98 S.Ct. 1452, 55 L.Ed.2d 496 (1978), the defendant argued that more than ten years had elapsed between the conviction he sought to overturn and his prior release from confinement. Less than ten years would have elapsed, had defendant not become a fugitive for two years. While a fugitive, however, the ten years passed. The court held:

> The defendant would not have had the protection of the ten-year limitation if he had not fled to avoid prosecution. By his **voluntary wrongful** act, he cannot gain the protection of Rule 609(b), which otherwise he would not have had.

*Id.* at 1000 (emphasis supplied). The court tolled the ten year limitation codified in 609(b) because only the defendant's voluntary wrongful act of fleeing enabled him to seek its benefit. The court thus construed the statutory time barrier by looking at the actual reasons behind defendant's delayed confinement. We also decline to foreclose the ability of district courts to construe the statutory time barrier by looking at the reasons underlying a defendant's confinement pursuant to a probation violation.

### 4. Cross-Examination Limitation.

#### A. Standard of Review

■ We review the district court's limitation of the scope of cross-examination for an abuse of discretion. *United States v. Kennedy*, 714 F.2d 968, 973 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984).

#### B. Analysis

■ The sixth amendment guarantees criminal defendants the right to cross-examine adverse witnesses. *Chipman v. Mercer*, 628 F.2d 528, 530 (9th Cir.1980). *See Davis v. Alaska*, 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 316, 94 S.Ct. at 1110. To accomplish this, cross-examination includes the right to show the witness's possible bias or self-interest in testifying. *Chip-*

*man,* 628 F.2d at 530. It is an abuse of discretion if the trial court limits cross-examination before "the jury ha[s] in its possession sufficient information to appraise the biases and motivations of the witness." *United States v. Bleckner,* 601 F.2d 382, 385 (9th Cir.1979); *see Chipman,* 628 F.2d at 530.

McClintock claims that the district court improperly limited his cross-examination of two government witnesses. First, he argues that the cross-examination of Lois McDonnell was improperly limited because he could not impeach her testimony by admitting a memorandum, exhibit CH. He claims this memorandum showed criminal charges against McDonnell had been dropped in return for her testimony against McClintock. Second, McClintock argues the district court improperly limited the cross-examination of Alois Geiger. Geiger testified on direct examination to an immunity agreement regarding his involvement with DDI. McClintock attempted to show that a release from IRS claims was an additional consideration for his testimony. The trial court found this testimony irrelevant.

 The district court did not improperly limit the cross-examination of McDonnell. First, contrary to McClintock's claims, the memorandum did not establish the existence of an immunity agreement. The memorandum does nothing more than state that a "subject," who is not identified but is presumably McDonnell, had been arrested for certain crimes and "wanted to deal the charges by providing information relating to" DDI. The memorandum then mentions that there would be a "preliminary interview of the subject to determine the worth of further discussions." As the

district court noted, this does not indicate that McDonnell had been promised immunity or any other consideration for her testimony. Second, the court did not restrict counsel from asking McDonnell questions concerning whether she received immunity.[7] We conclude that the district court did not prevent McClintock from showing McDonnell's "possible bias or self-interest."[8] *Chipman,* 628 F.2d at 530.

 We reach a similar conclusion regarding the cross-examination of Geiger. McClintock essentially argues that the considerations the Internal Revenue Service granted Geiger served as a reason for Geiger to testify against McClintock. McClintock did not make any offer of proof to substantiate the alleged connection between Geiger's testimony and his release from the IRS claims. We agree with the government that allowing this topic to be pursued on cross-examination could have planted an unfounded suspicion in the jury's mind. We cannot say that the district court abused its discretion in limiting this inquiry.

### 5. Hearsay and Confrontation Clause.

The government introduced under the business records exception to the hearsay rule the reports of evaluations of gemstones conducted by the Gemological Institute of America ("GIA") of Santa Monica, California. These evaluations were submitted to show the actual value of the gems at issue in three of the counts for which McClintock was convicted, Counts 1, 2, and 3. The evaluations and their respective reports were done by many grading technicians. These evaluations were done at GIA's offices in Santa Monica and resulted in routine grading reports. McClin-

7. In fact, the court encouraged counsel to pursue this approach. This is reflected in the following colloquy between court and counsel:

The Court: Yes, I'm going to do that [no mention of arrest allowed], Mr. Karras. I think *you can ask her whether or not she got* immunity, those kind of matters. Then if you want to use that document for some purpose you can decide if you want to do that. Then if you want to you'll—we can

decide anything beyond that. But I'm going to sustain any reference to an arrest.

8. We note that the district court was not confronted with limiting introduction of evidence of the crime with which McDonnell was actually charged. Thus, we are *not confronted with* the question whether the district court erred by not allowing into evidence the nature of the crime charged once an immunity agreement is established.

tock argues that the admission of these evaluations constituted error. He advances three major arguments: (1) there is insufficient foundation because it was expert testimony; (2) some reports were prepared in anticipation of litigation and were not trustworthy; and (3) McClintock's sixth amendment right to confrontation was denied.

### A. Standard of Review

 A district court's evidentiary rulings are reviewed for an abuse of discretion. *United States v. Turk,* 722 F.2d 1439, 1441 (9th Cir.1983).

### B. Analysis

#### (i) Expert opinion

This argument highlights a tension in the federal rules of evidence between the business records exception to the hearsay rule, Fed.R.Evid. 803(6), and the requirement that the qualifications of an expert witness be established, Fed.R.Evid. 702. We addressed this concern in *United States v. Licavoli,* 604 F.2d 613 (9th Cir.1979), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980). At issue in *Licavoli* was the government's introduction into evidence of an appraisal of the value of a painting. We held that the district court did not abuse its discretion in admitting this appraisal under the business records exception, even though the government did not establish the appraiser's expert qualifications. We pointed out that Licavoli "failed to alert the district court to specific

facts raising any doubt concerning" the appraiser's qualifications. *Id.* at 623.

 In this case, McClintock objected to the admission of the reports into evidence primarily on the grounds of hearsay and confrontation. We fail to find in the record an objection concerning the expert qualifications of the preparers.[9] Thus, McClintock's objections did not go to the issue of whether the preparers of the reports would qualify as experts under Rule 702, but rather to the weight that should be afforded their expert testimony. Accordingly, these objections are properly considered under the confrontation analysis.

#### (ii) Confrontation clause

 The sixth amendment to the United States Constitution provides that the defendant in all criminal cases has the right "to be confronted with the witnesses against him." In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court "announced that confrontation clause analysis should proceed case-by-case under a two-track approach that tests the necessity and reliability of the contested testimony." *United States v. Perez,* 658 F.2d 654 at 660 (9th Cir.1981) (citing *Roberts,* 448 U.S. at 65–66, 100 S.Ct. at 2538–2539). The first consideration is the "rule of necessity" established by the sixth amendment. *Roberts,* 448 U.S. at 65, 100 S.Ct. at 2538. "In the usual case ... the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Id.* This necessity requirement is not "absolute." *Perez,*

---

**9.** McClintock's counsel did raise an objection to lack of foundation "based upon the questions I have asked and the offer of proof." The "questions" we understand counsel was referring to occurred during a **voir dire** of Hurwit and seem to concern foundation for admission under Rule 803 as opposed to Rule 702. The same is true of his offer of proof (*e.g.,* "she has no knowledge that the report was made at or near the time of receiving the information or doing the work"). As counsel said shortly thereafter, "the testimony is as to the general practice as opposed ...."

McClintock does not now argue the district court erred in accepting this foundation testimo-

ny under Rule 803. Nor should he, because the district court did not abuse the broad discretion it has in these matters. *See United States v. Long,* 706 F.2d 1044, 1054 (9th Cir.1983). We add that even if the district court erred in admitting these records without requiring the government to establish the qualifications of the preparers of the report, any error is not reversible error. Our review of the record convinces us that there is no doubt that the other admissible evidence is so substantial that any error in admitting these reports was harmless. *Cf. United States v. Kahan & Lessin Co.,* 695 F.2d 1122, 1124 (9th Cir.1982) (if there was error it was harmless "in light of other evidence").

658 F.2d at 661. The government is not required to produce a seemingly available witness when the "utility of trial confrontation [is] remote." *Roberts*, 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7. Furthermore, "[t]estimony that is neither 'crucial' to the prosecution nor 'devastating' to the defendant might not be subject to the necessity requirement." *Perez*, 658 F.2d at 661 (*citing Dutton v. Evans*, 400 U.S. 74 at 87, 89, 91 S.Ct. 210 at 219, 220, 27 L.Ed.2d 213 (1970)). If the government establishes the unavailability of the witness, *Roberts* then requires that the declarant's statement bear adequate "indicia of reliability." *Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539.

■ Although recognizing the closeness of this issue, we conclude that McClintock was denied his sixth amendment right to confront his accusers. The GIA reports of the in-lab evaluations went to an essential element of the case—the quality of the stones sold by DDI. The government failed to produce or demonstrate the unavailability of the preparers of the GIA reports. *See Roberts*, 448 U.S. at 65, 100 S.Ct. at 2538. Because of the importance of these reports in establishing essential elements of the charged offenses, the evidence contained in them was both crucial to the prosecution and devastating to the defendant. *See Perez*, 658 F.2d at 661. Furthermore, because of the various means of evaluation and apparent subjective decisions that enter into the evaluation of gems, McClintock's confrontation of the preparers of the reports may have been valuable to his defense. *See Roberts*, 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7. Accordingly, the failure of the government to either produce or demonstrate the unavailability of the preparers of these reports constituted a violation of McClintock's constitutional right to confront his accusers.

■ We now must decide whether this error of constitutional magnitude should "be deemed harmless, not requiring the automatic reversal of the conviction." *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); *see United States v. Hasting*, 461 U.S. 499, 506–09, 103 S.Ct. 1974, 1979–81, 76 L.Ed.2d 96, 105–06 (1983). We cannot hold a constitutional error such as this to be harmless unless, after a review of the whole record, we believe that the error was harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828; *Hasting*, 461 U.S. at 510–511, 103 S.Ct. at 1981, 76 L.Ed.2d at 107.

We are unable to conclude that the error to him is harmless beyond a reasonable doubt. We have already pointed out the importance of these reports to the government's case and the potential value of cross-examination to McClintock's case. We hold that the "probable impact ... on the minds of an average jury," *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972) (quoting *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969)), is such that this evidence was sufficiently prejudicial as to require reversal of McClintock's conviction on Counts 1, 2, and 3. Because the GIA reports did not establish the value of any gems involved in Counts 11, 12, 13, 14, and 15, those counts are not affected by this holding.[10]

### 6. Unanimous Verdict.

#### A. Standard of Review

■ An appellate court reviews the district court's finding that a jury's verdict is unanimous under the clearly erroneous standard. *United States v. Jamison*, 493 F.2d 823, 824 (6th Cir.), *cert. denied*, 419 U.S. 847, 95 S.Ct. 83, 42 L.Ed.2d 76 (1974).

#### B. Analysis

■ McClintock argues that the jury verdict was not unanimous because one

10. In a memorandum responding to an inquiry of this court on this matter, McClintock contended that the GIA reports served as evidence to support McClintock's convictions on these counts. McClintock points out that the indictment on these counts incorporated the allegations that DDI offered for sale and sold stones of an inferior quality, allegations for which the GIA reports were relevant. For Counts 11 through 15, however, no stones were delivered to the victims. We do not believe that the admission of the GIA reports affected these counts. In any event, even if they did, we hold any error as to these counts to be harmless.

juror's response to the court's poll demonstrated an uncertainty as to whether she agreed with the verdict. That juror first asked the clerk to repeat the question. She then asked for permission to speak. The Court responded that she would have to acknowledge whether the verdict was hers or not. After a long pause the juror responded "yes." The rest of the members were polled and the jury was discharged.

McClintock argues that the juror's behavior demonstrated sufficient uncertainty to require the district court pursuant to Fed.R.Crim.P. 31(d) to either retire the jury for further deliberations or declare a mistrial. The district court found that the juror was "obviously emotionally affected" but that it would have been inappropriate to allow her to do more than indicate whether the verdict was hers or not.

A jury verdict in a federal criminal trial must be unanimous. Fed.R.Crim.P. 31(a). *United States v. Lopez*, 581 F.2d 1338, 1341 (9th Cir.1978). Rule 31(d) provides for polling of the jury to insure that each member agrees with the verdict and to discover possible coercion. *United States v. Spitz*, 696 F.2d 916, 917 (11th Cir.1983).

The record here shows on its face that the verdict was unanimous. *See United States v. Freedson*, 608 F.2d 739, 741 (9th Cir.1979) (final verdict was not indefinite or qualified on its face). The only possible showing of uncertainty or contingency in the jury's verdict comes from the juror's emotional state and delayed response. In *United States v. Aimone*, 715 F.2d 822 (3d Cir.1983), the Third Circuit faced similar circumstances. One juror initially responded "no" to the court's poll of the jury. After additional deliberations, she responded "yes" but, as one defense attorney described, the juror had "her hands in the air and shrugged and was crying and shook her head and said 'yes' in a tone of resignation...." *Id.* at 831. The court held that under such circumstances it must rely on the trial judge's appraisal of the unanimity of the verdict. *Id.* at 832.

We also must rely on the trial court's appraisal of the circumstances here. Only the trial judge could determine whether or not her affirmative response to the poll was tainted, coerced or in any other way demonstrative of uncertainty. Accordingly, we do not find the district court's finding of unanimity to be in error.

## CONCLUSION

The district court erred in denying McClintock the right to cross-examine the preparers of the GIA reports. The error was not harmless. The error demands reversal of the three counts on which McClintock was convicted for which the GIA reports went to the quality of the stones.

McClintock's conviction on Counts 1, 2, and 3 are REVERSED; his conviction on the other counts is AFFIRMED.